UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | | | |
|---|---|---|---|
| RLI INSURANCE COMPANY, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| v. | ) | Lead Case No.: | 1:23-cv-01079-MMM |
| | ) | Member Case No.: | 1:24-cv-01092-MMM |
| BRIGGS BROTHERS ENTERPRISES | ) | Member Case No.: | 1:24-cv-01102-MMM |
| CORPORATION, *et al.*, | ) | Member Case No.: | 1:24-cv-01134-MMM |
| | ) | | |
| Defendants. | ) | | |

## ORDER AND OPINION

Now before the Court is RLI Insurance Company's Motion for Preliminary Injunction. ECF No. 72. For the reasons that follow, RLI's Motion is **GRANTED**.

## BACKGROUND[1]

On December 1, 2019, RLI and Briggs Brothers Enterprises Corporation, through its President Terry Briggs, (collectively "Briggs") executed an Indemnity Agreement. Under the terms of the agreement, Briggs agreed to exonerate, indemnify, and hold RLI harmless from and against all loss sustained from or related to any surety bonds issued on behalf of Briggs. ECF No. 73-2 at ¶ 3. Surety bonds are a three-party agreement in which a surety (RLI) guarantees to an obligee (contractor/sub-contractor) that the principal (Briggs) will fulfil its contractual obligations under the bond. If the principal fails to meet its obligations under the bond agreement, the obligee can file a claim against the bond requiring the surety to cover any losses.

A "Loss" under the parties' Indemnity Agreement included "[a]ny and all cost and expense of any kind or nature, including attorney fees, consulting, and other professional fees and expenses

---

[1] The facts contained in this section come from the parties briefs, ECF Nos. 73, 75–77, and testimony heard by the Court on April 29–30, May 5, and May 12–13 of this year.

which [RLI] incurs in connection with any Bond or with enforcing the terms of [the] Agreement." *Id.* at ¶ d. A "Default" is defined as "*any communication* [sent to RLI] constituting a claim, notice, demand, or request for payment related to any Bond." *Id.* at ¶ e(k) (emphasis added).

The Indemnity Agreement also contained the following language on contract funds:

> 7. Contract Funds are Trust Funds. If any of the Bonds are executed in connection with a Contract, [Briggs], as trustees, covenant and agree that all payments received for or on account of said Contract or obligation shall be held as a trust fund, in which [RLI] has an interest, for the payment of debts incurred in the performance of the Contract or obligation and for any labor, materials, services, equipment or supplies furnished in the prosecution of the work provided in said Contract or obligation or any authorized extension or modification thereof; and further, [Briggs] expressly understand[s] and declare[s] that all monies due and to become due under any Contract or obligations covered by any Bond are trust funds, whether in the possession of [Briggs] or otherwise, for the benefit of and for payment of all such obligations in connection with any such Contract or obligations for which [RLI] would be liable under any Bond, which said trust also inures [sic] to the benefit of [RLI] for any liability or loss it may have or sustain under any Bond, and this Agreement and declaration shall also constitute notice of such trust. If [RLI] satisfies any liability on any Bond, [RLI] shall be entitled to assert the claim of the claimant to the trust funds, in its own name or that of the claimant. In addition to the trust obligations agreed to hereinabove and not as a requirement to such trust obligations, [Briggs] shall, upon demand of [RLI], open an account in a bank or other depository approved by [RLI], in the name of [RLI] or designated as a trust account for [RLI], and shall deposit therein all monies received from the contracts covered by any Bond. Withdrawals from the trust account shall require countersignature by a representative of [RLI]. The trust shall terminate upon satisfaction of all obligations for which the trust is hereby created, or 20 years from the date of this Agreement, whichever occurs first.

*Id.* at ¶ 7.

Prior to the execution of the December 2019 Indemnity Agreement, Briggs originally planned on receiving surety bonds from a different company. However, discussions with that company fell through. This last-minute challenge left Briggs in a hurry to find a replacement surety. Mr. Briggs was then connected with RLI, which agreed to issue his company bonds pursuant to the execution of the Indemnity Agreement. Mr. Briggs admits that due to a fast-approaching deadline to secure a bond for an upcoming project, he quickly signed the Indemnity

2

Agreement without fully reading its terms. Mr. Briggs also admits that he did not review the agreement in the time period following execution of the agreement.

Relying on the Indemnity Agreement, RLI issued multiple surety bonds naming Briggs as principal. Several of those issued bonds related to the Massey Oaks Projects in Houston, Texas:

- Bond No.: RCB0035235 (the "Detention Bond") issued in relation to the Detention Project in the penal amount of $3,783,327.77;

- Bond No.: RCB0037840 (the "Paving Bond") issued in relation to the Paving Project in the penal amount of $2,291,366.83; and

- Bond No.: RCB0041889 (the "South Harkey Road Bond") issued in relation to the South Harkey Road Project in the penal amount of $5,279,802.00.

Jumping to March 2022, more than two years after the Indemnity Agreement was executed, RLI began to receive payment bond claims of default for payment and performance bonds issued on behalf of Briggs. By December 2022, RLI had received over 50 claims related to bonds issued for projects, which included the Massey Oaks Bonds. The parties agree that many of these claims were tied to Steven Boyd, a contractor hired by Briggs, and T3 Civil, a subcontractor hired to perform work on the construction projects. While RLI and Briggs disagree on whether all the claims filed by T3 Civil were valid, there is no dispute that the decision to hire Steven Boyd was entirely Mr. Briggs decision. If Boyd was conspiring with T3 Civil not to pay subcontractors, that was not RLI's fault.

On December 19, 2022, RLI traveled to Briggs' Houston, Texas office in an attempt to stop the hemorrhaging caused by the flood of claims. RLI came back to Briggs' office the next day to review its records and discuss next steps; however, Mr. Briggs was not in attendance due to a previously planned family vacation (hard to understand the necessity of a family vacation when

3

faced with a potentially disastrous business failure). By the end of the second day, it was clear that the parties had not reached a plan on how to address the rising number of claims. Subsequently, RLI issued letters on December 29, 2022, to bonded project owners instructing them to withhold contract funds. RLI also sent a letter to Briggs regarding the hold funds letters and its willingness to explore paths forward. RLI alleges that to date it has incurred losses to subcontractors and suppliers in relation to the Massey Oaks Projects that exceed $1.6 million.

In recent months, RLI received notice that Briggs has received $800,000.00 for the settlement of a mechanic's lien related to the Massey Oaks Projects. After learning of the settlement, RLI sent a letter to Briggs on February 17, 2025, demanding that those funds be placed into a trust account for safekeeping pursuant to the language in Paragraph 7 of the Indemnity Agreement and that Briggs provide all documentation related to the purported settlement of claims arising from the Massey Oaks Projects. ECF No. 73-6. Briggs failed to respond to RLI's request, but does not refute that it received a settlement payment or that the payment was in connection with the Massey Oaks Projects. In response, RLI filed its Motion for Preliminary Injunction on March 11, 2025, requesting that Briggs deposit the proceeds received in relation to the Massey Oaks Projects into a bank account as a trust account.

Since the filing of its Motion for Preliminary Injunction, RLI has confirmed the amounts received by Briggs. In addition to the Massey Oaks settlement, RLI claims that it has also uncovered additional amounts paid to Briggs Brothers in relation to a claim against another RLI bonded Project known as Paving Improvements to Serve Idleloch Phase II for Starlight Homes Texas, LLC (the "Starlight Project"). ECF No. 77-3. The Settlement Agreement amount on the Starlight Project totaled $275,000.00. On March 25, 2025, RLI filed a Verified Supplement to its

4

Motion for Preliminary Injunction seeking an order that all bonded contract proceeds ($1,075,000.00) be placed into a trust account. ECF No. 77.

Currently, RLI claims that it remains open to payment bond claims of subcontractors and suppliers of Briggs in excess of $2,000,000.00 with respect to the Massey Oaks projects. ECF No. 73-1 at ¶ 18. Several claimants also have pending litigation against RLI based on Briggs' alleged failures on the Massey Oaks Projects. *Id.* at ¶ 17–18. To date, RLI has paid approximately $6,352,817.41 to settle payment bond claims across all Bonds issued on behalf of Briggs. *Id.* at ¶ 15. At the time RLI filed its Motion for Preliminary Injunction, RLI stated that it has paid 58 payment bond claimants across 17 bonded contracts. *Id.* RLI has also paid $1,273,977.87 to resolve performance bond claims for Bonds issued on behalf of Briggs Brothers in relation to ten bonded Projects. *Id.* Over the course of several days in April and May, the Court heard testimony and oral argument on RLI's Motion for Preliminary Injunction. At the conclusion of the arguments the Court granted RLI's motion. This order now follows.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 65(a) establishes the Court's procedure on applications for a preliminary injunction. Preliminary injunctions are issued to protect the moving party from irreparable injury and to preserve the Court's power to render a meaningful decision after a trial on the merits. To obtain a preliminary injunction the moving party must show: (1) that it is likely to succeed on the merits, (2) that it has no adequate remedy at law, and (3) that it will suffer irreparable harm in the absence of an injunction. *DM Trans, LLC v. Scott*, 38 F.4th 608, 617 (7th Cir. 2022). The moving party's likelihood of success on the merits must exceed a mere possibility of success; however, before making this determination the Court must first reach the threshold question of whether irreparable harm is present to grant injunctive relief. *Id.* at 618 ("Because

irreparable harm is a threshold requirement for granting injunctive relief, we first analyze whether the district court erred in concluding [the Plaintiff] had not shown irreparable harm."). If the moving party satisfies the first three elements, the Court must then weigh the factors against one another, "assessing whether the balance of harms favors the moving party or whether the harm to other parties or the public is sufficiently weighty that the injunction should be denied." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 323–24 (7th Cir. 2015) (citations omitted).

## DISCUSSION

### I.    Likelihood of Success on the Merits

RLI has shown that it is likely to succeed on the merits of this case. RLI claims that the plain language of the Indemnity Agreement specifically and unequivocally requires the Indemnitors to hold Project funds in trust for safekeeping to protect RLI from loss. It is a common practice within the industry to require principals to agree to the terms like those included in Paragraph 7 prior to issuing bonds. The terms of these agreements ensure that both sureties and subcontractors are protected from a breach under the terms of the bond and are a crucial aspect of how construction projects are completed throughout the country. In response, Briggs argues that RLI has failed to make the necessary showing for each claim to warrant entry of a preliminary injunction. Briggs fails to cite any case law or federal rule to support this claim. Nor could it given that Courts have never held that movants seeking a preliminary injunction must show it will prevail on *every* claim.

The most relevant claim at issue here is RLI's claim for breach of indemnity agreement. "Indemnity agreements are contracts and, as such, are to be construed like any other contract. In construing indemnity contracts, the primary focus is to give effect to the intention of the parties. This is especially so when the intent of the parties is clear and unambiguous." *Hanover Ins. Co. v.*

*Smith*, 182 Ill. App.3d 793, 796 (Ill. App. Ct. 1989). Under Illinois law, a plaintiff looking to state a colorable breach of contract claim must allege four elements: (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages. *Hanover Ins. Grp.*, 2012 WL 2368328 at *4 (citing *Reger Development LLC v. Nat. City Bank*, 592 F.3d 759, 764 (7th Cir.2010)).

There can be no doubt that the parties had an existing and enforceable contract. The parties conducted an arm's length transaction in which RLI agreed to issue bonds to Briggs' projects. In exchange Briggs agreed to "exonerate, indemnify, and hold [RLI] harmless from and against all Loss" sustained from or related to any surety bonds issued on its behalf. ECF No. 73-2. Previous arguments raised by Briggs that it is not bound by the terms of the Indemnity Agreement have all failed. RLI has also provided substantial performance under the Indemnity Agreements. At the request of Briggs, RLI issued numerous surety bonds, including payment bonds, performance bonds, bid bonds, and certain other bonds naming Briggs Brothers as principal. ECF No. 23 at 3. Briggs does not refute the fact that it breached the contract, arguing in the alternative that RLI's violation of good faith relieves it from performance. Based on the plain language of the contract, RLI is well within its rights to request that Briggs deposit the contract funds into a trust account. During its closing arguments, Briggs argued that the Indemnity Agreement was unconscionable. However, these types of agreements are the nature of surety agreements. And these agreements are what fuel the construction industry across the nation.

Finally, RLI has confirmed that Briggs has received over one million dollars in relation to its claims against the Massey Oaks and Starlight Projects. In an attempt to recover the funds, RLI claims that under Paragraph 7 of the Indemnity Agreement Briggs was obligated to place any amounts received into a bank account or other depository as a trust account for RLI. On these facts

7

alone there is a strong suggestion that RLI would likely succeed on the merits that Briggs breached the terms of the indemnity agreement.

**II.     Irreparable Harm in the Absence of an Injunction and Adequate Remedy at Law**

The Court now looks at whether denial of RLI's motion would constitute irreparable injury. *DM Trans*, 38 F.4th at 618. RLI argues that allowing Briggs to ignore the provisions of the Indemnity agreement would cause it to lose the bargained-for right under the Indemnity Agreement, and therefore constitutes an irreparable harm. Typically, "[h]arm is irreparable if legal remedies available to the movant are inadequate, meaning they are seriously deficient as compared to the harm suffered." *Id.* Cases in this Court and our sister courts within the Seventh Circuit have held that forcing a movant to wait for a possible judgment for money damages without the relief of "specific performance pursuant to the cited provision of [an] indemnity agreement is not an adequate remedy and would *irreparably harm* the Plaintiff . . . by depriving it of pre-judgment relief to which it is contractually entitled." *United Fire & Cas. Co. v. Coggeshall Constr. Co.*, No. 91-3159, 1991 WL 169147, at *2 (C.D. Ill. June 28, 1991) (emphasis added); *see also Hanover Ins. Grp. v. Singles Roofing Co., Inc.*, No. 10 C 611, 2012 WL 2368328, at *12 (N.D. Ill. June 21, 2012) (holding that the plaintiff met its burden to show it would suffer irreparable harm if it was denied pre-judgment relief to which it was contractually entitled to); *see Travelers Cas. And Sur. Co. v. Ockerlaund*, No. 04 C 3963, 2004 WL 1794915, *5 (N.D. Ill. Aug. 6, 2004) ("[U]nder the law of suretyship, even if a surety's loss is monetary and only temporary, that it must assume a primary obligor's obligation at all is a harm for which there is no adequate remedy at law."); *see Hartford Fire Ins. Co. v. 3i Constr., LLC*, No. 3:16-CV-00992-M, 2017 WL 3209522, at *4 (N.D. Tex. May 18, 2017).

In response, Briggs claims that RLI has failed to meet its burden because a material breach of contract by a party will exclude performance by the other party. ECF No. 76 at 6 (quotations omitted). Briggs specifically argues that because RLI has breached its duty of good faith and commercial reasonableness standards under Article 9 of the Uniform Commercial Code ("UCC") it is exempt from comporting to Paragraph 7 of the Indemnity Agreement. *Id.* For support, Briggs cites to *Full Circle Villagebrook GP, LLC v. Protech 2004-D, LLC* for the position that "material breach of contract by a party will excuse performance by the other party." 119 F. 4th 522, 526 (7th Cir. 2024) (citing *Costello v. Grundon*, 651 F.3d 614, 640 (7th Cir. 2011)). The facts in *Full Circle* concerned a business partnership governed by a contract's option clause that allowed any partner to purchase interests of the Limited Partners based on the fair market value of the property. *Id.* at 524. In order to determine the value of the interests, partners were required to select an appraiser from an approved list. *Id.* Although *Full Circle* concerns contract interpretation, nowhere in the opinion does it address a surety relationship. Additionally, *Full Circle* addressed a motion for summary judgment, therefore the analysis considered by that court is different from the standard here.

This is not the first time that the Court has addressed Briggs' Article 9 arguments. On January 5, 2024, the Court entered an order denying Briggs' motion to dismiss, in which it argued that RLI violated the UCC. ECF No. 32 at 17–21. In that order, the Court outlined how multiple courts "have recognized that Article 9 has no application in the surety context when a surety enforces collateral rights that stem from the doctrine of equitable subrogation and reimbursement." *Id.* at 18. On January 28, 2025, the Court also dismissed Briggs' claim that RLI owed it a duty of good faith. Although Article 9 was not expressly cited, Illinois courts do not recognize an

9

independent cause of action for breach of the implied duty of good faith and fair dealing. ECF No. 65 at 20–21.

Based on this record, Briggs' claim of bad faith ha not been established. Here, RLI acted in good faith when faced with an avalanche of claims, lack of full cooperation (vacation), failure to provide requested financial information, etc. Briggs also claims that its performance under the Indemnity Agreement was excused. On this point Briggs claims that RLI failed to (a) judiciously and expeditiously handle claims against the various bonds issued in favor of applicable Briggs Brothers Enterprises Corporations, (b) sent letters to certain payment obligees demanding those obligees hold duly owed funds from applicable Briggs projects and (c) published in the letters false and defamatory statements concerning certain Briggs Brothers Enterprises Corporations. *Id.* As to Briggs' first point, the record reflects that RLI did exercise due diligence concerning the claims that it received. RLI also correctly sent out the letters to certain payment obligees pursuant to the terms of the Indemnity Agreement. On Briggs' final point, this record does not support that the letters contained any false or defamatory statements.

The Restatement (Third) of Suretyship and Guaranty suggests that RLI has met its burden. Under the Restatement, "a primary obligor has a duty to refrain from conduct that impairs the expectation of the secondary obligor that the principal obligor will honor its duty of performance." *See* Restatement (Third) of Suretyship and Guaranty § 21 cmt. J (1996). The facts of this case show that the high volume of claims on Briggs bonded projects was similar to a train wreck in slow motion. Although RLI *may* have been able to take additional steps to mitigate the harm caused by alleged invalid claims, that analysis does not shift the courts conclusion on the likelihood of success on the merits, irreparable harm, or adequate remedy at law.

Finally, Briggs claims that "the general rule is that monetary loss does not constitute an irreparable injury." ECF No. 7. The only case cited by Briggs on this issue is *Classic Components Supply, Inc. v. Mitsubishi Electronics America, Inc*. 841 F.2d 163, 164 (7th Cir. 1988). In *Classic Components*, the plaintiff sought an injunction from the Court compelling Mitsubishi Electronics America to continue using Classic as an electronics distributor. *Id.* When the court reached the issue of irreparable harm, it held that the plaintiff failed to meet its burden because its only allegation of harm was to its reputation. The instant case concerns enforcement of a contract provision within the surety context, not a situation where RLI seeks to continue business with Briggs to save its reputation. Case law on the issue of irreparable harm and adequate remedy establishes that Briggs' failure to deposit any proceeds received in relation to the bonds favors granting the injunction. RLI has therefore sufficiently established it will suffer an irreparable harm for which there is no adequate remedy at law.

### III.     Balance of Harms

The final step in the Court's analysis is to balance the harms between RLI and Briggs. *Hanover Ins. Grp.*, 2012 WL 2368328 at *15 ("[T]he Court must weigh the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief.") (internal quotations omitted). Based on the record before the Court, the balance weighs heavily in favor of RLI. The requested relief would put the parties in the position that they originally bargained for. *See id.* Briggs advances the claim that granting the injunction would be catastrophic to the business and likely force it to file for bankruptcy. Other than the word of Mr. Briggs, Defendants have failed to provide any financial statements to support this claim. Nor is the Cort aware of any additional accounts that Briggs may have. In fact, after the Court initially granted

11

RLI's motion on May 13, 2025, Mr. Briggs filed a notice on the docket that his PNC operating account only contained $17,732. This is significantly less than the $1,075,000 RLI originally sought. The Court therefore deems that Briggs' actions point to a need for the Court to enter an injunction. Alternatively, should Briggs succeed after a trial or on summary judgment, any funds it did deposit would be returned. *See Ockerlund*, 2004 WL 1794915 at *5.

Finally, there is no public policy interest that would be positively served by allowing Briggs to discharge its duty under the Indemnity Agreement. Illinois law supports giving effect to the intention of the parties in a contractual relationship. *See Schapich v. CIBC Bank* USA, 123 N.E.3d 93, 98 (Ill. App. Ct. 2018). In cases like this where the parties engaged in arm's length negotiations, any public interest considerations highly favor granting RLI's motion.

## CONCLUSION

The Court **GRANTS** RLI's Motion for Preliminary Judgment. ECF No. 72. The Court should **ORDER** Briggs to adhere to the following:

The Indemnitors shall deposit into the Court's Registry interest-bearing account the total of $1,047,500.00 within five (5) days of the issuance of this Order. To the extent current funds are less than the aforementioned amount, the Indemnitors must provide a full accounting and supporting records of prior disposition of funds. The trust shall terminate upon full satisfaction of all obligations for which the trust is hereby created or upon further Order from this Court.

**IT IS FURTHER ORDERED** that the Indemnitors are each enjoined and barred from spending, transferring, withdrawing, dissipating, selling, encumbering, utilizing, manipulating, or otherwise failing to preserve any property, including, but not limited to, monies, investments, or other funds held in cash or in any bank, financial, or other account in the name of the Indemnitors,

or any of them, and any tools, machinery and/or equipment in which Indemnitors, or any of them, have an interest pending the deposit with the Court's Registry cash as set forth above.

Entered on May 20, 2025.

*/s/ Michael M. Mihm*
Michael M. Mihm
United States District Judge
